TO BE PUBLISHED IN FEDERAL SUPPLEMENT 2D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

CONSOLIDATED
CIVIL ACTION NO. 9:10cv2152

| | |
|---|---|
| EDWARD I. SMITH | PLAINTIFF |
| VS. | |
| TELEDYNE CONTINENTAL MOTORS, INC., ET AL. | DEFENDANTS |

AND                    OPINION AND ORDER

CIVIL ACTION NO. 9:10cv2546

| | |
|---|---|
| JENNIFER DAWN JONES, Individually And as Administrator of the Estate of Robert Gary Jones | PLAINTIFF |
| VS. | |
| TELEDYNE CONTINENTAL MOTORS, INC., ET AL. | DEFENDANTS |

**BERTELSMAN, SENIOR DISTRICT JUDGE:**[1]

---

[1] The Honorable William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## INTRODUCTION

On March 15, 2010, at about 6:00 p.m., Robert Gary Jones, vacationing from his home in Georgia, was jogging on the beach at Hilton Head, South Carolina, when he was struck and killed by an airplane.

The plane, operated by Edward I. Smith, was a light single-engine aircraft Smith had made from a kit.  As he was flying the plane up the Atlantic coast about ten miles offshore, the propeller fell off the plane and into the sea.

Smith attempted to make the Hilton Head airport, but came up short, crash landing on the beach and fatally striking Jones.

Jones was a 38-year-old stockbroker who left behind his wife and two small children.  The Joneses were all citizens of Georgia.

Subsequently, Jones's wife, Jennifer, was appointed administrator of his estate and filed this action in the United States District Court for the District of South Carolina.  She named as defendants: Teledyne Continental Motors, Inc., the manufacturer of the airplane's engine, a citizen of Delaware and Alabama; Smith, a citizen of Virginia, as pilot of the plane;  Lancair International, Inc., manufacturer of the airframe, a citizen of Oregon;  Penn Yan Aero Service, Inc., a citizen of New York, which had serviced the plane prior to the crash; and Hartzell Propeller, Inc., a citizen of  Ohio,  manufacturer of the propeller.

Smith filed a separate action against defendants, Teledyne Continental Motors, Inc. and Hartzell Propeller, Inc., for damage to his airplane. His action was later consolidated with that of the Jones estate.

Lancair International, Inc. was subsequently dismissed by agreement.

All defendants have acceded to the personal jurisdiction of this Court except Teledyne, which filed motions to dismiss for lack of personal jurisdiction. The Court ordered discovery to be conducted on this issue and appropriate briefing. Oral argument was held on the motions on December 15, 2011, at Charleston, and the motion is now ripe for decision.

## ANALYSIS

### A. Preliminary matters

Although some of the parties have argued the case as one of "general jurisdiction," under which rubric it must be shown that a party's presence in the forum state is so continuous and systematic that it may be deemed to be "at home" there,[2] as the subsequent discussion herein will illustrate, Teledyne's presence in South Carolina is not that pervasive. For the reasons hereafter discussed, however, the Court does hold that specific jurisdiction over Teledyne is proper and its motions to dismiss must be **DENIED.**

---

[2] *See Goodyear Dunlop Tires Operations v. Brown,* __U.S. __ , 131 S. Ct. 2846, 2851 (2011).

### B. *McIntyre Machinery, Ltd. v. Nicastro*

Having carefully analyzed precedents of the Supreme Court of the United States and the Fourth Circuit, this Court concludes that the recent decision of the Supreme Court in *J. McIntyre Machinery, Ltd. v. Nicastro,* __ U.S. __, 131 S. Ct. 2780 (2011), and existing Fourth Circuit precedents are dispositive of the issue at bar.

The *McIntyre* decision is somewhat difficult to interpret because no single opinion was adopted by a majority of the Justices.  Rather, there are three opinions which must be synthesized.

At the outset, a *caveat* must be noted:  The plurality opinion, expressing the views of four Justices, does not state the holding of the Court.

> It is well established, under *Marks v. United States*, 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), that when a decision of the Court lacks a majority opinion, the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding.  430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). The *Marks* rule does not apply, however, unless "the narrowest opinion represents 'a common denominator of the Court's reasoning' and 'embod[ies] a position implicitly approved by at least five Justices who support the judgment.'" *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1254 (D.C. Cir. 1988) (quoting *King v. Palmer* , 950 F.2d 771, 781 (D.C. Cir. 1991)).

*A.T. Massey Coal Co., Inc. v. Massanari*, 305 F.3d 226, 236 (4th Cir. 2002).

As this Court interprets *McIntyre,* the "common denominator of the Court's reasoning" and "a position approved by at least five Justices who support the

4

judgment" is the "stream-of-commerce plus" rubric enunciated in an opinion by Justice O'Connor in *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 112 (1987).

*McIntyre*, like *Asahi,* is a products liability case involving a product which was manufactured in a foreign country, which the "stream of commerce" brought to the United States. In *Asahi,* it was valve stems for motorcycle tires; in *McIntyre,* it was an industrial machine. The defendants were foreign corporations. The commerce was foreign commerce.

In both cases, the Court held that personal jurisdiction did not exist because the defendants had engaged in no conduct which would subject them to being sued in a foreign country without offending "traditional notions of fair play and substantial justice."[3]

In *Asahi*, Justice O'Connor filed an opinion. Part II-B, in which seven Justices concurred, applied a straightforward reasonableness test. Under this test, these Justices agreed that it would be unduly burdensome on this foreign defendant -- and thus a violation of due process -- to permit it to be subjected to suit in the United States when it had engaged in minimal activity in this country, even though a fair number of its valve stems were found in tires sold here.

---

[3] *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation and internal quotation marks omitted).

Justice O'Connor was joined by three other Justices in Part II-A of the same opinion stating that the mere foreseeability that a product placed into interstate commerce would end up in the forum state was not enough for personal jurisdiction, as advocated by four Justices in a concurring opinion. *Asahi*, 408 U.S. at 112.

Rather, she referred to cases which held that to be subject to such jurisdiction manufacturers "must have made deliberate decisions to market their products in the forum state." *Id.* at 111-12.

Justice O'Connor continued:

> We now find this latter position to be consonant with the requirements of due process. The "substantial connection," *Burger King*, 471 U.S., at 475, 105 S.Ct., at 2184; *McGee*, 355 U.S., at 223, 78 S.Ct., at 201, between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State*. *Burger King*, *supra*, 471 U.S., at 476, 105 S.Ct., at 2184; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate <u>an intent or purpose to serve the market in the forum State</u>, for example, designing the product for the market in the forum State, <u>advertising in the forum State, establishing channels for providing regular advice to customers in the forum State</u>, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 112 (underlining added).

This view has come to be known as the "stream-of-commerce plus" test. Although it did not win the support of a majority of the Court in *Asahi,* in the view of this Court, it has now done so in *McIntyre.*

As noted, *McIntyre* also involved a product -- an industrial machine -- which was manufactured outside the United States and caused an injury in the United States.

Three opinions were filed by various members of the Court.

In the plurality opinion, four Justices expressed their strong view that the propriety of exercising personal jurisdiction should be based on concepts of national or state sovereignty rather than on foreseeability, convenience or the interests of the judicial system. *McIntyre*, 131 S. Ct. at 2789-90.

However, when this mode of analysis was applied to the facts (which reflected minimal activity by the defendant), the rationale was similar to Justice O'Connor's "stream-of-commerce plus" test. *Id.* at 2790-91. The plurality emphatically rejected the pure "foreseeability" test, advocated by a dissenting opinion in which three Justices joined. *Id.*

The concurring opinion by two Justices agreed with the result of the plurality opinion, but rejected the plurality's stricter approach emphasizing sovereignty. *Id.* at 2793-94. These concurring Justices expressed the view that the case could be resolved by existing precedents, including Justice O'Connor's

opinion in *Asahi* and the balancing test put forth in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). *Id.* at 2792. Thus, six Justices agree that, at a minimum, the limitations of Justice O'Connor's test should be applied, although the plurality would apply an even stricter test, the parameters of which were not precisely defined.[4]

Therefore, the "stream-of-commerce plus" test now commands a majority of the Court.

### C. Fourth Circuit Cases

The Fourth Circuit has already adopted this view and, therefore, the long-arm cases in the Fourth Circuit are not affected by *McIntyre*. In this respect, this Court agrees with the analysis in the recent Maryland District Court opinion by Judge Bredar. *Windsor v. Spinner Industry Co., Ltd.,* __ F.Supp. 2d __, Civil No. JKB-10-114, 2011 WL 5005199, at *5 (D. Md. Oct. 20, 2011).

*Windsor* cites as embodying Fourth Circuit law *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir. 1994). This Court agrees.

In *Lesnick,* the Court thoroughly explored the Supreme Court cases, especially *World-Wide Volkswagen* and *Asahi.* Following an extensive analysis of these precedents, the court succinctly summarized the proper analysis for long-arm issues in product liability cases:

---

[4] *Cf. Oticon v. Sebotek Hearing Sys., LLC*, __ F. Supp.2d __, Civil Action No. 08-5489 (FLW), at *9 (D.N.J. Aug. 22, 2011).

> Thus, we hold that the test to be applied in considering the reach of personal jurisdiction inquires whether (1) the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protections of the laws of the state; and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice, taking into account such factors as (a) the burden on the defendant, (b) the interests of the forum state, (c) the plaintiff's interest in obtaining relief, (d) the efficient resolution of controversies as between states, and (e) the shared interests of the several states in furthering fundamental substantive social policies.  *See Hanson*, 357 U.S. at 253, 78 S.Ct. at 1239; *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183; *Asahi*, 480 U.S. at 113, 107 S.Ct. at 1033.

*Id.* at 945-46.

A word shall be said about *World-Wide Volkswagen*.  Despite the title, the defendants in that case were a Northeastern retailer and distributor of Audi automobiles, one of which was involved in an accident in the forum state.  Key to the Court's rejection of personal jurisdiction was its observation that the defendants "carry on no activity whatsoever in Oklahoma . . . no sales . . . no services . . . .  They avail themselves of none of the privileges and benefits of Oklahoma law.  They solicit no business there . . .  or seek to serve the Oklahoma market."  444 U.S. at 295.

The Court observed further that it is whether the "defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there" that is the critical factor.    444 U.S. at 297.

Teledyne's activities in South Carolina are such that it should have had such reasonable anticipation.

### D. Personal Jurisdiction over Teledyne is Proper.

#### 1. Substantial Connection to South Carolina

The first question in the *Lesnick* analysis is "whether the defendant has created a substantial connection to the forum state by action purposefully directed toward the forum state or otherwise invoking the benefits and protection of the laws of the state." *Lesnick*, 35 F.3d at 945-46.

It is apparent that Teledyne meets this test. Over the past ten years, Teledyne has sold at least 400 engines directly to South Carolina purchasers at a cost of about $40,000 apiece for a total revenue of approximately $1,600,000. (Doc. 148 at 21; Doc. 158-2 at 24). Further, its engines are installed in approximately one-third of general aviation aircraft based in South Carolina. It maintains a continuous relationship with the owners of these engines through its warranty programs.

Further, it advertises in South Carolina through aviation magazines. It maintained a distributor here until 2004. It directly sells parts for its engines and other products to South Carolina customers through one or more interactive websites. It provides warranty work on its engines in the state. It investigates crashes in South Carolina involving airplanes containing its engines.

Significantly, Teledyne maintains ongoing relationships with at least eleven "fixed base operators" (FBOs). These are stores/service centers located at South Carolina airports. Teledyne has a contract with each FBO which requires it to display Teledyne's logos and actively promote the sale of its products. Teledyne maintains a continuing interactive internet relationship with these FBOs, through which it provides them with technical support in repairing Teledyne products. Teledyne warranty work must be performed by these FBOs.

Teledyne both buys and sells products over the internet and through retailers to South Carolina residents. It admits it has derived over $1 million in revenue from its sales to South Carolina residents over the past 10 years. (Doc. 148 at 37-38).

One may assume that Teledyne -- not appearing to be a corporate shrinking violet -- would sue any of the FBOs which violated their contracts, or any of its customers who did not pay their bills. Thus, it has "invoked the benefits and protections" of South Carolina law.[5]

It may be seen from the above that Teledyne meets the literal requirements of the South Carolina long-arm statute,[6] which provides that a court may exercise

---

[5] Jones's memorandum in opposition enumerates many more significant contacts by which Teledyne targets or purposefully directs commercial activities at South Carolina.

[6] S.C. Code Ann. § 36-2-803.

11

specific personal jurisdiction over an entity which "acts directly or by an agent as to a cause of action arising from" the entity's

> * * *
>
> (4) causing tortious injury or death in this State by an act or omission outside this State if [it] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

S.C. Code Ann. § 36-2-803(A)(4).

Teledyne argues that it is saved from the effects of this unambiguous provision by S.C. Code Ann. § 36-2-803(B), which provides : "When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him."

This argument is without merit because the complaints allege that Teledyne, by supplying an engine with design or manufacturing defects outside South Carolina, did "caus[e] tortious injury [and] death in this State by an act or omission outside this State." Thus, the causes of action alleged did arise from the acts enumerated in the statute, *i.e.*, the "act" of supplying an allegedly defective engine.[7] The "substantial revenue" language is not "an act enumerated in the statute" from which a cause of action could arise, but merely refers to the minimum contacts required.

---

[7] The South Carolina long-arm statute has been held to be co-extensive with due process, and thus only due process analysis need be performed. *Cockrell v. Hillerich & Bradsby Co.*, 611 S.E.2d 505, 508 (S.C. 2005); *Meyer v. Paschal*, 498 S.E.2d 635, 638 (S.C. 1998). It should be noted, however, that Teledyne's activities here satisfy the literal text of the statute.

2. Traditional notions of fair play and substantial justice.

The second branch of the Fourth Circuit's *Lesnick* test requires an inquiry whether "the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice. . . ." *Lesnick*, 35 F.3d at 946.

The *Lesnick* court enumerated four factors derived from the Supreme Court's personal jurisdiction cases, to be considered in this determination:

- a. the burden of the defendant;
- b. the interests of the forum state;
- c. the plaintiff's interest in obtaining relief;
- d. the efficient resolution of controversies as between states; and
- e. the shared interests of the several states in furthering substantive social policies.

*Id.*

The application of these factors to the claims against Teledyne compel the conclusion that the exercise of specific jurisdiction over it would not "offend traditional notions of fair play and substantial justice."

  a. The additional burden on the defendant is relatively slight as compared to the cost of litigating the matter in its home state.

Teledyne has a national presence and organization. It has, not unfairly, been referred to as the "Ford Motor Company of aviation."

b.  The interests of the forum state are extremely strong, in that South Carolina, located on a major coastal air corridor, has a compelling interest in protecting its citizens and visitors and their property from damage from falling airplanes.

c.  The plaintiffs and other parties can only obtain a complete resolution of their claims and defenses in an action where all of the claims among the parties can be resolved in one forum. Otherwise, they would have to sue Teledyne separately in its home state, Alabama. The defendants in South Carolina could then point to the empty chair, placing blame on Teledyne, while Teledyne similarly points to the empty chairs in Alabama.

d. and e.  The interests of the judicial system and of the various sovereigns involved also require the resolution of these claims in one forum. It seems likely to this Court that liability may need to be apportioned among the various claimants and defendants. This can

only be done in a single forum. If claims among all parties are not resolved here there will have to be equally complex suits for contribution and indemnity in other courts in other states, a situation which would give rise to the danger of inconsistent results and burden the courts of several states with excessive, overlapping litigation. Thus, litigation would be prolonged over decades rather than years. The best chance of a settlement, thus avoiding a highly-complex trial, is if all the claims can be resolved in one court.

## CONCLUSION

In *Goodyear Dunlop Tires,* the Supreme Court states:

> The North Carolina court's stream-of-commerce analysis elided the essential difference between case-specific and all-purpose (general) jurisdiction. Flow of a manufacturer's products into the forum, we have explained, may bolster an affiliation germane to *specific* jurisdiction. *See, e.g., World-Wide Volkswagen*, 444 U.S., at 297, 100 S.Ct. 559 (where "the sale of a product . . . is not simply an isolated occurrence, <u>but arises from the efforts of the manufacturer or distributor to serve . . . the market for its product in [several] States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise</u> *has there been the source of injury to its owner or to others*" (emphasis added).

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2855 (2011) (underlining added).

This language fits the present case exactly. In none of the cases cited by Teledyne did the defendant have the degree of contacts with the forum state approaching those of Teledyne in this case.

Therefore, the exercise of specific jurisdiction over Teledyne in this case is proper.

Therefore, having reviewed this matter, and being otherwise sufficiently advised,

**IT IS ORDERED** that Teledyne's motions to dismiss (Docs. 15, 60) be, and are hereby, **DENIED**. The parties shall adhere to the discovery deadline previously set by the Court.

This 3rd day of January, 2012.



Signed By:
William O. Bertelsman  WOB
United States District Judge